# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan H. Lefkow | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 200 | **DATE** | 1/5/2004 |
| **CASE TITLE** | | Ruvalcaba vs. Jaimet | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. For the reasons stated in the Memorandum Opinion and Order, the court concludes that petitioner is not entitled to relief and petition for writ of habeas corpus is hereby denied and case is terminated.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | 3 | **Document Number** |
| | No notices required. | | number of notices | |
| X | Notices mailed by judge's staff. | | JAN 06 2004 | |
| | Notified counsel by telephone. | | date docketed | |
| | Docketing to mail notices. | | | 27 |
| X | Mail AO 450 form. Mailed by MD. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | 1/5/2004 | |
| MD | courtroom deputy's initials | | date mailed notice | |
| | | | MD | |
| | | | mailing deputy initials | |

U.S. DISTRICT COURT
CLERK
04 JAN -6 PM 8:04
FILED
Date/time received in central Clerk's Office

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

United States of America       )
ex rel. ALEJANDRO RUVALCABA   )
(#K-63734),                   )
                             )
      Petitioner,          )
                             )
      vs.                  )   No. 01 C 0200
                             )   Judge Joan H. Lefkow
DANNY JAIMET,          )
Warden,                 )
Hill Correctional Center,[1]   )
                             )
      Respondent.       )
                             )

DOCKETED

JAN 0 6 2004

## MEMORANDUM OPINION AND ORDER

In his petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, petitioner

Alejandro Ruvalcaba ("Ruvalcaba") challenges his conviction for first degree murder and

attempted first degree murder entered in the Circuit Court of Cook County, Illinois. Ruvalcaba

raises the following claims: (1) his confession given while he was a juvenile was involuntary;

(2) the police arrested him without a warrant; (3) prosecutorial misconduct; (4) the State failed to

prove him guilty beyond a reasonable doubt; and (5) the trial court abused its discretion when it

imposed an excessive sentence.[2]  For the reasons set forth below, the petition is denied.

---

[1]Ruvalcaba is in the custody of Danny Jaimet ("Jaimet"), Warden of the Hill Correctional Center. Thus, Jaimet is the proper respondent in this habeas action. *See* Rule 2(a) of the Rules Governing Habeas Corpus Cases under 28 U.S.C. § 2254. Accordingly, this court substitutes Jaimet as respondent. *See* Fed. R. Civ. P. 25(d)(1).

[2]Originally, Ruvalcaba filed a *pro se* habeas petition, where he raised all five claims. The parties briefed these claims. Thereafter, on October 31, 2001, the court granted Ruvalcaba's motion for appointment of counsel. Ruvalcaba's counsel submitted an amended petition, in the form of a memorandum, arguing only the involuntary confession claim. (See Am. Pet.) Ruvalcaba's underlying *pro se* claims, however, may be addressed by this court on habeas review. *Cf. Hayes* v. *Hawes*, 921 F.2d 100, 101 (7th Cir. 1990) ("Although there is no Sixth Amendment

(continued...)



# HABEAS STANDARDS

Pursuant to the Antiterrorism and Effective Death Penalty Act ("AEDPA"), a court must deny a petition for a writ of habeas corpus with respect to any claim adjudicated on the merits in the state court unless the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding." 28 U.S.C. § 2254(d); *Price* v. *Vincent*, 538 U.S. 634, __, 123 S. Ct. 1848, 1852 (2003). A state court's decision is contrary to clearly established Supreme Court precedent "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law" or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [it]." *Williams* v. *Taylor*, 529 U.S. 362, 405 (2000). In order for a state court decision to be considered "unreasonable" under this standard it must be more than incorrect, it must lie "well outside the boundaries of permissible differences of opinion." *Hardaway* v. *Young*, 302 F.3d 757, 762 (7th Cir. 2002); *see also Schultz* v. *Page*, 313 F.3d 1010, 1015 (7th Cir. 2002) ("The state court decision is reasonable if it is minimally consistent with the facts and circumstances of the case.") (internal citations and quotations omitted).

Before reviewing the state courts' decisions, however, the court must determine whether the petitioner fairly presented his federal claims to the state courts, as any claim not presented to

---

[2](...continued)

right to file a pro se brief when the appellant is represented by counsel, nothing precludes an appellate court from accepting the pro se brief and considering the arguments contained therein for whatever they may be worth."). Thus, the court addresses the *pro se* claims herein.

the state's highest court is deemed procedurally defaulted. *O'Sullivan* v. *Boerckel*, 526 U.S. 838, 844-45 (1999). Moreover, "[a] federal court will not review a question of federal law decided by a state court if the decision of the state court rests on a state procedural ground that is independent of the federal question and adequate to support the judgment." *Moore* v. *Bryant*, 295 F.3d 771, 774 (7th Cir. 2002). A federal court may not grant habeas relief on a defaulted claim unless the petitioner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claim will result in fundamental miscarriage of justice. *Coleman* v. *Thompson*, 501 U.S. 722, 750 (1991); *Anderson* v. *Cowen*, 227 F.3d 893, 899 (7th Cir. 2000).

## FACTS

When considering a habeas petition, the court must presume that the state courts' factual determinations are correct unless Ruvalcaba rebuts the presumption by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1); *Todd* v. *Schomig*, 283 F.3d 842, 846 (7th Cir. 2002).[3] The facts below, a verbatim recitation of the facts from the Illinois Appellate Court's direct review of Ruvalcaba's conviction, are established:

> On the evening of November 7, 1994, in an alley on the south side of Chicago and as a result of a random shooting, Hiram Martinez was killed and his companions, Carlos Flores and Luis Sanchez, were wounded. Sixteen-year-old defendant, Alejandro Ruvalcaba, also known as "Ace," was arrested at 11:30 that same evening and taken to the Area 1 police station where he subsequently confessed to shooting his loaded gun into the alley. Defendant and co-defendants, Juan Meneses and Juan Alvarez, were indicted for Martinez's murder and the attempted murder of Flores and Sanchez.

---

[3]For his involuntary confession claim, Ruvalcaba asserts that the Illinois Appellate Court made unreasonable determinations based on the trial court record. The court addresses Ruvalcaba's argument in the discussion section.

Prior to defendant's first trial, defendant moved to suppress his confession and to quash his arrest and suppress his statements, which the trial court denied. Defendant's first trial on the charges resulted in a verdict of not guilty for the attempted murder of Sanchez and a hung jury on the other charges. The jury in defendant's second trial found defendant guilty of the murder of Martinez and the attempted murder of Flores. This appeal followed.

In his motion to suppress his confession, defendant alleged, in pertinent part, that the police officers had not attempted to notify his parents of his arrest, he was refused an attorney because he was told he "did not need an attorney," he had not intelligently waived his right to an attorney, and, because the police had psychologically coerced him into giving a court-reported statement, his statement was involuntary.

The evidence presented during the hearing on defendant's motion to suppress his confession revealed that Officer Joseph Gula and his partner had gone to the Ruvalcaba residence at 5443 South California in Chicago after being asked by fellow detectives, who were investigating the November 7 shooting, to locate defendant. There, they spoke to defendant's brother, Ricardo, the only person home, and explained, without disclosing the nature of the investigation, that they were looking for defendant. Ricardo informed the officers that defendant was not at home. Some time later, after arresting codefendants Juan Meneses and Juan Alvarez, but failing to find defendant, Gula returned to the Ruvalcaba residence. When no one answered the door, Gula left his business card in the door. Gula then, upon learning that defendant's girlfriend lived on the 5500 block of South Mozart, went to that location where he found defendant and transported him to the Area 1 Violent Crimes Unit. Subsequent to defendant's arrest at 11:30 p.m., Gula was asked to locate defendant's parents, and he went back to the Ruvalcaba residence at 2 a.m. on November 8, but he found no one at home and his business card still in the door.

Further evidence revealed that, at approximately 11:30 p.m., defendant was placed in an interview room and his handcuffs were removed. Detective William Moser, in the presence of Detective Albert Graf, read defendant his *Miranda* rights, and defendant responded that he understood each one, including the one stating that he could be charged and tried as an adult. A youth officer was not present but, according to Moser, one eventually came into the interrogation room and, during that time a brief conversation, lasting 15 to 20 seconds, occurred. Defendant asked Moser why he was there; the youth officer responded that it was a murder investigation; and defendant, in turn, responded that he did not know anything about a murder.

4

Moser testified that, shortly after defendant's arrival at the police station, he had asked defendant where his parents were, and defendant responded that he did not know. Moser also asked defendant for his home telephone number, but defendant did not supply one. Moser then sent tactical officers to 5556 South Mozart, the residence of defendant's girlfriend where defendant stated he was living, and Moser sent tactical officers, a second time, to the Ruvalcaba home on South California, where no one answered the door.

Moser further testified that defendant participated in a lineup with codefendants Meneses and Alvarez shortly after midnight. Thereafter, Moser went into the interrogation room several times throughout the late evening and mid-morning hours to check on defendant's "well-being," and asked defendant if he needed to use the washroom or if he was either thirsty or hungry. At 9 a.m. on November 8, Moser and Youth Officer Magnus Burney were present during a 10-minute interrogation conducted by Assistant State's Attorney Thomas Biesty. Biesty recited from memory defendant's *Miranda* rights, and defendant denied knowing anything about a murder. Moser also spoke with defendant's girlfriend, Diana Caguana, who had brought her's [sic] and defendant's baby to Area 1. Sometime after 9 a.m., defendant asked that a picture of Caguana be taken, and at 10 a.m., a picture was taken "to prove to defendant that Caguana was at the station." Moser never told defendant that he could not see Caguana prior to the picture being taken. Rather, Moser allowed Caguana to speak with defendant at 11 a.m. upon defendant's request.

At 11:30 a.m. Biesty, after giving defendant his *Miranda* rights and informing him that he was not defendant's attorney but rather the prosecutor, interrogated defendant in the presence of Moser and Burney. Pursuant to defendant's inquiry as to what his codefendants were saying, Biesty showed defendant copies of the codefendants' statements without telling defendant that he had to conform his statement to those of his codefendants. Defendant confessed and then chose to memorialize his oral statement. At 12:40 p.m., in the presence of Moser, Biesty, and Burney, defendant gave a court-reported statement.

According to Moser, defendant was allowed to use the bathroom, to sleep, and to eat, and defendant never asked to use the telephone or to consult with either a family member or an attorney. Defendant appeared to "be a competent and intelligent young man," who understood Moser's questions, answered them clearly, understood written and spoken English, and had not waived his *Miranda* rights. Defendant had not been continuously questioned during his 14-hour detention, and no detective had told defendant that he did not need an attorney or that if he cooperated or implicated codefendant Meneses he would be released.

Detective Albert Graf testified that he had purchased food for defendant and the codefendants on two separate occasions: the first time between 3 and 3:30 a.m. and the next time at approximately 8:30 a.m.

Assistant State's Attorney Biesty corroborated Detective Moser's testimony regarding defendant's interrogations.

Defendant's father, Rosario, and brother, Abel, testified that they had returned to their home around 10 p.m. on November 7 to find the police searching the home for defendant. The police left, and neither Rosario nor Abel heard anyone come back to the house the remainder of the night or the next morning. The front door of the house had a buzzer, but it was not working according to Rosario.

Caguana testified that she had spoken to the police as well as an assistant State's Attorney at Area 1 where a picture of her and her baby had been taken. According to Caguana, the detective had not permitted her a contact visit with defendant.

Defendant testified that he had been questioned twice by a police officer upon arriving at Area 2, but on neither occasion had he been advised about his right to remain silent. During the second interrogation, defendant had asked the officer to call either defendant's aunt or one of his friends so they, in turn, could contact his father because the Ruvalcaba residence did not have a telephone, but the officer told defendant that defendant could not make a telephone call. A third interrogation occurred, during which time the officer denied defendant's request to contact his father. Defendant further stated that he could not remember whether the officer had read him his *Miranda* rights. Also during this interrogation, the officer had told defendant that, although Caguana was present at the station, defendant could not see her until he "cooperated" with the police. When defendant refused to answer any question posed by the officer, the officer had told defendant that "he was going to go get [Caguana] and get the truth out of her. And if she tried lying that he was going to make sure he put her in jail and take the baby, and make sure the baby ended up in D.C.F.S." When defendant expressed his disbelief that Caguana was at the station, the officer left the room and returned with a picture of Caguana and the baby. Defendant denied having seen Caguana prior to his giving his statement.

Defendant further testified that the assistant State's Attorney had advised him of his *Miranda* rights, but he did not waive them. Defendant could not recall if anyone had advised him that he would be charged as an adult, and no one had explained to him that his statement could be used against him. According to defendant, the assistant State's Attorney had told him that he knew defendant was

not the person who had fatally shot the victim Martinez, but to stop lying and cooperate because the only person police were interested in was codefendant Meneses and that defendant could leave as soon as he gave a statement. Defendant further stated that Biesty had shown him codefendant Alvarez's statement, telling him that "in order for everything to work out * * * whatever [defendant said] would have to be in compliance with whatever [codefendant] Alvarez said. So it could help us out." Defendant then decided to give a statement so that he could go to work and because he was hungry. Defendant did not see a youth officer until after he was given a copy of his statement to sign. According to defendant, the youth officer did not speak with him.

On cross-examination, defendant testified that he signed each page of his court-reported statement which contained his answers that the police had treated him "good" and had fed him, no one had made any promises to him or threatened him prior to his giving his statement, and that he had slept, understood his rights, and had been allowed to use the washroom. Defendant admitted that while giving his statement he had not had Alvarez's statement and that he had not complained to the detective that the assistant State's Attorney had forced him to change his confession.

In rebuttal, Youth Officer Burney testified that he had been present during the 9 and 11:30 a.m. interrogations and the taking of defendant's court-reported statement and that defendant had been given his rights each time. No one had told defendant to say anything in particular or to conform his statement to another codefendant's so that he would be released. Defendant never asked to make a telephone call, and no one had advised defendant that he did not need an attorney because the police knew defendant did not shoot the victims and was not the target of the investigation.

Following the parties' arguments, the trial court denied defendant's motion to suppress his confession, basing its determination on the witnesses' credibility. The court found that the officers had substantially complied with the requirements contained in the Juvenile Court Act. The court further found that defendant had not been subjected to intense psychological pressures and had voluntarily given his statement after being advised of his constitutional and juvenile rights.

Subsequent to this ruling, the court heard evidence concerning defendant's motion to quash arrest and suppress evidence allegedly illegally obtained. Defendant alleged in his motion, in pertinent part, that the arresting officers did not have probable cause and/or a reasonable suspicion that defendant had committed, was committing, or was about to commit a crime and that, as a result of his "illegal arrest," the prosecution had acquired evidence violative of defendant's constitutional rights.

At the hearing, Detective Graf testified that he had spoken with three witnesses at the crime scene, two of whom were Flores and Sanchez, who had told him that they had earlier been walking with Martinez in an alley near 2719 West 59th Street when they were approached by two people wearing dark clothing, the taller of whom asked, "What's up, 26'er?" Sanchez responded, "What's up?" The two groups then passed each other, and Flores and Sanchez looked behind them as they were walking and saw the two individuals draw weapons and start randomly firing at them. They ran for cover and subsequently returned to the crime scene to discover Martinez fatally shot.

Israel Cobian, the third witness to whom Graf had spoken, told him that he had been approached earlier that day by codefendant Meneses, whom he knew as "Sinister," and by codefendant Alvarez, whom he knew as "Smack." Sinister was visibly upset because someone had just broken the windshield of his car, and Sinister asked Cobian if he knew who had done the damage. Cobian told Sinister that he did not know, and Sinister and Smack walked away. Shortly thereafter, Cobian saw Sinister, Smack and another passenger drive by in the car with the smashed windshield; he saw the car turn into 59th Street; he then heard several gunshots coming from the general direction the car had taken; he ran towards 59th Street to investigate; and, as he approached the street, he saw Sinister running from an alley to his parked car and speeding away.

After speaking with Detective Graf, Cobian directed Graf and other detectives to Sinister's residence located three blocks from the homicide scene. Once there, Cobian pointed out the car he had seen Sinister driving: a late model, blue Cadillac Seville, with heavy damage to its windshield, parked in front of the residence. Graf and the detectives entered the residence and spoke to the mother and sister of codefendant Meneses. The sister told them that the car belonged to her brother, Meneses, that he went by the nickname Sinister, and that he had just left with his friends, Ace (defendant) and Smack (codefendant Alvarez). Graf relayed this information to other tactical officers, who, in turn, told him that defendant, Meneses, and Alvarez were members of the Latin Kings street gang and the victims belonged to a rival street gang known as the LaRaza. Graf then told the tactical officers to locate defendant and codefendants.

Officer Gula testified that, as a 9th District gang tactical officer, he was familiar with the gangs in the district. Because of this familiarity, Gula knew the victims as members of the LaRaza street gang and knew that the LaRaza and the Latin Kings were rivals. Gula stated that he had received instructions from the detectives who had spoken to Meneses' sister to locate and bring to Area 1 three individuals, whom they identified as Sinister, Ace, and Smack. Gula, having previously dealt with Sinister on a number of different occasions, knew that Sinister's given name was Meneses and that he was a member of the Latin Kings.

8

Gula also knew that Ace (defendant) was another Latin Kings gang member. Gula did not know a person by the nickname of Smack, but a fellow 9th District gang tactical officer informed Gula that Smack was codefendant Alvarez. Responding to the instructions he had received from the detectives, Gula made a warrantless arrest of defendant at Caguana's residence.

Following the parties' arguments, the trial court denied defendant's motion to quash arrest and suppress evidence, finding that the officers had probable cause to arrest defendant.

At defendant's second trial, the following pertinent testimony was introduced. The LaRaza and Latin Kings had been "at war" with each other, and the area bounded by 59th-61st and Fairfield-Washtenaw, the vicinity where the crimes occurred, was LaRaza territory. In addition, Flores and Sanchez, the victims of the attempted murder and fellow LaRaza street gang members, each testified that they had seen defendant, without warning or provocation, pull a gun from his waistband and fire shots at them and Martinez as they were attempting to flee. Flores and Sanchez fled the alley and reached Sanchez's house, where Sanchez told Flores to get a gun hidden by the LaRaza in a window sill of a nearby house. Flores retrieved the gun, and he and Sanchez returned to the alley and discovered Martinez lying on the pavement, fatally shot. Flores and Sanchez left the crime scene to return the gun to its hiding place, but returned once again to the alley and related what they had just experienced to the police, who had recently arrived. Both Flores and Sanchez testified that neither of them had, nor had Martinez, a gun on them prior to the shooting.

Cobian's testimony from defendant's first trial was read to the jury and into the record. Cobian had observed Meneses driving his car slowly south on Washtenaw toward 59th Street about 15 minutes after Meneses had approached him on foot, questioning him whether he knew who had broken the windshield of his car. Alvarez was sitting in the front passenger seat and defendant, whom Cobian knew to be a Latin Kings street gang member known as Ace, was sitting in the back seat. Cobian identified defendant, as well as Meneses and Alvarez, in a lineup as being the three individuals whom he had seen in Meneses' car on the night of the shootings.

Assistant State's Attorney Biesty read into evidence defendant's court-reported statement, which contained the following pertinent facts. Defendant had been at Caguana's home on November 7 at approximately 7 or 7:30 p.m. when Meneses, Alvarez, and a third person whom defendant knew as Chaos came to visit. Meneses asked defendant to get the .32 revolver that Meneses had previously given defendant, and defendant retrieved the revolver, loaded with a single round, from the bedroom. Defendant then accompanied Meneses, Alvarez,

and Chaos back to Meneses' residence where Meneses retrieved a .9-millimeter automatic gun. The four then proceeded to the alley, and Meneses made a hand gesture depicting a gun, which meant, to defendant, that Meneses wanted to go and shoot the persons who had damaged his car's windshield. Defendant followed Meneses into the alley, while Alvarez stayed behind in Meneses' car and Chaos served as a "lookout" for "cops."

Once in the alley, defendant saw three unknown individuals approaching him and Meneses. One of the three "threw up" the LaRaza street gang sign and said, "What's up, LaRaza." In response, Meneses "threw up" the gang sign of the 26ers, a gang allied to the LaRaza, and said, "What's up 26ers." Immediately thereafter, Meneses pulled out his gun and fired approximately 10 shots at the three individuals, who began running away from defendant and Meneses. Defendant then pulled his gun and pointed it "towards this big fence" that was in the direction of the running individuals, and fired it until the one round went off. Defendant and Meneses returned to the car and sped away with Alvarez to Meneses' home, where defendant washed his hands.

Dr. Donna Hunsaker, a Cook County deputy medical examiner, testified that Martinez died of a through-and-through gunshot wound to the chest and that his cause of death was a homicide.

Detective Graf testified that he had recovered two guns in the garage of Meneses' home: a partially loaded .9-millimeter semiautomatic pistol and an empty .32 caliber revolver. Ernest Warner, a firearms examiner for the Chicago police crime lab, testified that he had examined the two weapons and had concluded that 11 discharged cartridge cases had been fired from the .9-millimeter semiautomatic pistol.

Robert Berk, an Illinois State Police crime lab analyst, testified for the defense. He stated that he had performed gunshot residue (GSR) on the victims. Based on his observations, Berk concluded that gunshot residue had existed on Flores' right palm, although Berk could not conclude whether Flores had discharged a weapon. The GSR tests conducted on Martinez and Sanchez were inconclusive.

Defendant testified that he had followed Meneses into the alley, not knowing that Meneses was going to shoot and kill someone. After Meneses and the victims exchanged greetings, Meneses and Flores started "shooting at each other." Martinez and Sanchez then began to run down the alley when defendant pulled out his gun and shot once toward a fence on his right. Defendant fired the gun because he "didn't want to be in a situation where they might get a chance to shoot back-to shoot at me." After firing the gun, defendant ran back to Meneses'

car and returned to Meneses' house, where he gave his gun to Meneses and washed his hands.

Defendant further testified that his court-reported statement did not accurately reflect what had occurred on November 7 because Biesty had told him what to say in the statement. Specifically, Biesty told him to say that Chaos had served as a lookout and that Meneses had made a hand gesture to him indicating a gun prior to their entering the alley. Biesty had also told him to demonstrate the handgun gesture during the court-reported statement.

On cross-examination, defendant testified that he believed he and Meneses were only going to break windows as they walked into the alley with their guns. Defendant admitted that the victims were not armed. Defendant stated that before he had fired his gun he could see that Martinez was stumbling, and, when he had fired his gun, Flores and Sanchez were running "further away from" him.

In rebuttal, Biesty testified that he had not told defendant to make a hand gesture depicting a gun when defendant had given his court-reported statement and that defendant's court-reported statement was almost a verbatim transcript of his oral statement.

After the parties rested, the jury found defendant guilty of first degree murder and attempted first degree murder, and, after hearing testimony in aggravation and mitigation, the trial court sentenced defendant to 50 years' imprisonment for first degree murder and 30 years for attempted murder, the sentences to be served concurrently. This appeal followed.

(Resp. Ex. B at 2-16.)

## PROCEDURAL HISTORY

At his first trial, Ruvalcaba was found not guilty of the attempted first degree murder of Sanchez. (Resp. Ex. A at 1 ¶ 2.) The jury was unable to reach a verdict on the charges of first degree murder of Martinez and attempted first degree murder of Flores. (*Id.*) The State retried Ruvalcaba on those remaining offenses. (*Id.*) At the second trial, Ruvalcaba was convicted of first degree murder of Martinez and attempted first degree murder of Flores. (*Id.*) Thereafter, the trial court sentenced him to 50 years' imprisonment for the first degree murder offense and 30

years' imprisonment on the attempted first degree murder offense. The sentences run concurrently. (*Id.*)

Ruvalcaba appealed his conviction to the Illinois Appellate Court. On June 30, 2000, that court affirmed the conviction and sentence. (Resp. Ex. B.) On August 1, 2000, Ruvalcaba filed a *pro se* petition for leave to appeal to the Illinois Supreme Court. (Resp. Ex. C, Supreme Court of Illinois, Case No. 89959, Pet. For Leave to Appeal.) That petition was denied on October 4, 2000. (Resp. Ex. D, Supreme Court of Illinois, Case No. 89959, Order of Oct. 4, 2000.) On January 10, 2001, Ruvalcaba filed the instant petition for a writ of habeas corpus. Because Ruvalcaba filed his habeas petition within the one-year statute of limitations under 28 U.S.C. § 2244(d)(1), the court has jurisdiction to consider the petition. *See Gray* v. *Briley*, 305 F.3d 777, 778-79 (7th Cir. 2002).

### DISCUSSION

**A.    Claim (1): involuntary confession**

Ruvalcaba claims that the Illinois Appellate Court failed to follow United States Supreme Court precedent because it did not hold that the trial court erred in failing to suppress his confession where the police questioned him in the absence of his parents and counsel, and relied on coercive and deceitful techniques. (Am. Pet. at 3.) Because Ruvalcaba fairly presented this claim on direct review, the court reviews the claim on the merits.

In *Hardaway* v. *Young*, 302 F.3d 757 (7th Cir. 2002), the Seventh Circuit addressed the United States Supreme Court standards for juvenile confessions as follows:

> The voluntariness of a confession, whether made by a juvenile or an adult, is evaluated on the basis of the totality of the circumstances surrounding that confession. *Schneckloth* v. *Bustamonte*, 412 U.S. 218, 226 . . . (1973); *Fare* v.

12

> *Michael C.*, 442 U.S. 707, 725 . . . (1979). In juvenile cases, the totality approach requires an "evaluation of the juvenile's age, experience, education, background, and intelligence" as well as the circumstances regarding the confession. *Fare*, 42 U.S. at 725. . . . The Supreme Court in the past has spoken of the need to exercise "special caution" when assessing the voluntariness of a juvenile confession, particularly where there is prolonged or repeated questioning or when the interrogation occurs in the absence of a parent, lawyer, or other friendly adult. *In re Gault*, 387 U.S. 1, 45 . . . (1967); *Gallegoes* v. *Colorado*, 370 U.S. 49, 53-55 . . . (1962); *Haley* v. *Ohio*, 332 U.S. 596, 599-601 . . . (1948).

*Hardaway*, 392 F.3d at 762; *see also Schneckloth*, 412 U.S. at 226 (factors include the youth of the accused, his lack of education, or his low intelligence, the lack of advice to the accused of his constitutional rights, the length of detention, the repeated and prolonged nature of the questioning, and the use of physical punishment such as the deprivation of food or sleep). In addition, the court verifies the factual circumstances surrounding the confession, assesses the psychological impact on the accused, and evaluates the legal significance of how the accused reacted. *Id.*

The Illinois Appellate Court concluded that the trial court was not in error for determining that Ruvalcaba's statement was voluntary and not the subject of police coercion. (Resp. Ex. B at 19.) It first reasoned that Ruvalcaba never told anyone, including the Assistant State's Attorney ("ASA") or the youth officer, that police threatened him, and he never mentioned any such threat during either his oral or lengthy written confession. The Illinois Appellate Court also relied on Ruvalcaba's court-reported statement that he confessed because he was hungry and he wanted to go home. (*Id.* at 20.) The court noted that Ruvalcaba made no mention of any threat during his testimony at trial and that he presented no evidence to corroborate his claim that the police coerced him prior to his confession. (*Id.*) The court also relied on the police officers' denial of Ruvalcaba's claims of coercion, along with Ruvalcaba's

statements that he had been fed prior to giving his court-reported statement, that he received "good" treatment by the police and the ASA, that he was able to sleep, had not been threatened, had no promises posed to him in exchange for his statement, had understood all of his rights, and had been allowed to use the washroom. (*Id.*) Finally, the Illinois Appellate Court relied on Ruvalcaba's concession that, while giving the court-reported statement, he did not have codefendant Alvarez's statement and he had not complained to the detective that the ASA forced him to change his confession to conform with Alvarez's statement. (*Id.*)

In addition, the Illinois Appellate Court weighed various factors under the totality of the circumstances standard to determine the admissibility of Ruvalcaba's statement. (*Id.*) Specifically, the court found that Ruvalcaba was a 16-year-old who had attended high school up to his sophomore year and was of, at least, average intelligence. (*Id.* at 21.) The court relied on Detective Moser's testimony that Ruvalcaba appeared to be a competent and intelligent young man who understood his questions and answered them clearly and understood written and spoken English. (*Id.*) Further, the court found Ruvalcaba's background probative, in that Ruvalcaba admitted that he was a street gang member and thus was "streetwise." (*Id.*) The Illinois Appellate Court further found that Ruvalcaba's detention was lawful, and his 12 to 13-hour detention preceding the court-reported statement was not an unreasonable amount of time. It noted that confessions made after longer detention periods had been found to be voluntary. (*Id.*) The court also found that the interrogations themselves were not lengthy, and that Ruvalcaba was not handcuffed. (*Id.*) Finally, the court determined that Ruvalcaba received long rest periods between each interrogation and that, each time the police interrogated Ruvalcaba, he indicated that he understood his *Miranda* rights. (*Id.*) In sum, the Illinois Appellate Court held that, under

14

the totality of the circumstances, the trial court's denial of Ruvalcaba's motion to suppress his statements was not contrary to the manifest weight of the evidence. (*Id.* at 24.)

Ruvalcaba does not argue that the Illinois Appellate Court's decision was "contrary to" established Supreme Court precedent. Instead, he alleges that the court unreasonably determined, based on the totality of circumstances, that his confession was voluntary. In determining whether the Illinois Appellate Court's decision was a reasonable application of the totality of circumstances test, the court looks to *Hardaway*, which also examined whether a decision of an Illinois Appellate Court that a juvenile's confession was voluntary was a reasonable application of established Supreme Court precedent.

In *Hardaway*, the petitioner, a 14-year-old boy, confessed under police questioning to the murder of an 11-year-old boy. The petitioner had been awakened in bed by the police at around 8:00 a.m., and placed unhandcuffed in an unlocked interview room at about 8:30 a.m. The petitioner was questioned at that time by police detectives. 302 F.3d at 759-60. He was next questioned at around 10:30 a.m., and for the first time was read his *Miranda* rights. *Id.* The court noted that over the next six hours the petitioner was questioned on a number of matters, but that he spent most of this time alone. At 4:30 p.m., the petitioner was questioned by two new police detectives and was once again read his *Miranda* warnings. *Id.* At this time the petitioner changed his story and confessed to his role in the crime. *Id.* Questioning then stopped until approximately 7:00 p.m., when an ASA and youth officer were contacted. *Id.* at 761. The petitioner was once again read his *Miranda* rights, and he once again confessed to his role in the crime, and subsequently agreed to repeat the statement to a court reporter. *Id.* The Seventh Circuit also made note of the state courts' findings that the petitioner's parents had never tried to

come to the police headquarters to see their son, the petitioner never asked for his parents or an attorney, and that the petitioner had not been abused or threatened in any way by detectives. *Id.* at 761.

In concluding that the state appellate court's decision was not unreasonable, the Seventh Circuit highlighted three factors, the petitioner's age, the absence of a friendly adult and the length and nature of the interrogation. *Id.* at 764. As for the petitioner's age of 14, the court expressed concern over the vulnerability a child of this age might face, but expressed no *per se* rule based on age and noted that "youth remains a critical factor for . . . consideration, and the younger the child the more carefully we will scrutinize police questioning tactics to determine if excessive coercion or intimidation or simply immaturity that would not affect an adult has tainted the juvenile's confession." *Id.* at 765.

Concerning the absence of an adult, the court stated that "[n]either federal statutory nor constitutional law requires a juvenile's parents be notified prior to obtaining a confession." *Id.* (quoting *Stone* v. *Farley*, 86 F.3d 712, 717 (7th Cir. 1996)). Once again, however, the court noted that "in marginal cases–when it appears the officer or agent has attempted to take advantage of the suspect's youth or mental shortcomings–lack of parental or legal advice could tip the balance against admission." *Id.* (quoting *United States* v. *Wilderness*, 160 F.3d 1173, 1176 (7th Cir. 1998)).

Finally, the court considered the length and nature of the interrogation. *Id.* at 766. The court noted that the petitioner, while in custody substantially longer, had been interrogated for less than 90 minutes and had not been subjected to coercive or deceptive interview techniques, "such as making [petitioner] strip and wear jail clothes or handcuffs, questioning him for lengthy

periods without a break, misrepresenting evidence, or showing graphic pictures of the murder scene." *Id.* Weighing all the evidence under the totality of the circumstances, the court expressed concern that an injustice may have been committed, but under the deferential standards of review under AEDPA, it determined that the state courts' decisions were not unreasonable. *Id.* at 760, 768.

Starting with Ruvalcaba's age, 16, although a minor, he was older than the petitioner in *Hardaway*, and a 16-year-old could reasonably be expected to be more mature and better able to handle himself in police custody than a 14-year-old. *See id.* at 764 (noting that "[c]hildren under the age of 16 are treated differently from adults under Illinois law in a host of different ways"); *see also, Fare* v. *Michael C.*, 442 U.S. 707, 726-27 (1979) (concluding that confession was voluntary where 16-year-old had a prior criminal record, had no signs of insufficient intelligence and had not been subjected to threats, intimidation or trickery). Thus, while Ruvalcaba's age must be scrutinized, it does not weigh as heavily as it would if Ruvalcaba had been younger than 16. Concerning the absence of an adult, there is no question that Ruvalcaba did not have a friendly adult with him, but this would only take on added relevance if this were a marginal case in which improper tactics or attempts to exploit Ruvalcaba's age were established.

This leaves the length and nature of the interrogation. In his habeas claim, Ruvalcaba challenges the facts as established by the Illinois Appellate Court because that court did not address a conversation between Ruvalcaba and Detective Moser that occurred after the line-up or one in which Detective Moser promised to prove to Ruvalcaba that his girlfriend was at the police station. (Am. Pet. at 15.) Further, Ruvalcaba asserts that the Illinois Appellate Court failed to address his contention that the police did not allow him to call a family member to

17

notify Ruvalcaba's father, particularly given Ruvalcaba's father's testimony that he was home all night.

Ruvalcaba's arguments notwithstanding, the court concludes that the Illinois Appellate Court made reasonable determinations based on the facts before it. Plainly, Ruvalcaba's challenge to the Illinois Appellate Court's reasoning concerns credibility determinations. On habeas review, this court does not make such determinations. *See Kines* v. *Godinez*, 7 F.3d 674, 678 (7th Cir. 1993) ("Federal courts are in no position to re-determine the credibility of witnesses observed by state trial courts."). Based on the court's review of the record, it is clear that the trial court at the suppression hearing and the jury at trial credited the State witnesses' testimony over the testimony of Ruvalcaba and his witnesses. In this context, the record reveals that, because Detective Moser's testimony was credited, he did not use coercive and deceptive techniques on Ruvalcaba that amounted to constitutional error. Thus, the Illinois Appellate Court's failure to address a conversation between Ruvalcaba and Detective Moser or the circumstances concerning the presence of Ruvalcaba's girlfriend were not unreasonable. Moreover, based on this credibility determination in favor of the State's witnesses, it was reasonable for the Illinois Appellate Court not to address Ruvalcaba's contention that the police officers did not allow him to make a phone call where the police officers testified that Ruvalcaba never in fact asked to make such a phone call.

Ruvalcaba also asserts that, under the totality of the circumstances, and bearing in mind his youth, the Illinois Appellate Court unreasonably determined that his confession was voluntary. However, the facts show that the Illinois Appellate Court's reasoning that Ruvalcaba's confession was voluntary under the totality of the circumstances was not

unreasonable. Although Ruvalcaba's youth was a special factor, he is unable to show that he did understand the nature of his actions or that he was more susceptible to coercive and deceptive techniques. He was a 16-year-old who attended high school up to and including his sophomore year. Based on his gang affiliation, the court deemed him "streetwise." Most significantly, based in its credibility determination in favor of the State's witnesses, the Illinois Appellate Court determined that the police officers used proper interrogation tactics, and their interrogations were not lengthy and continuous.

Finally, the Illinois Appellate Court found that the police officers explained to Ruvalcaba that he was being questioned in connection with a murder. They informed him of all the rights delineated in *Miranda*. The record does not show that Ruvalcaba was of insufficient intelligence to understand the rights he was waiving, or what would be the consequences of that waiver. Thus, the Illinois Appellate Court reasonably determined that Ruvalcaba's statements were voluntary under the totality of the circumstances.

For these reasons, Ruvalcaba does not show that the Illinois Appellate Court's decision involved an unreasonable determination of the facts in light of the evidence presented before the trial court. Additionally, Ruvalcaba does not show that the Illinois Appellate Court's reasoning was contrary to, or involved an unreasonable application of, clearly established federal law. *See* § 2254(d)(1); *Williams*, 529 U.S. at 407. Thus, the court denies claim (1).

**B.     Claim (2): the police arrested Ruvalcaba without a warrant**

Ruvalcaba claims that the police arrested him without a warrant in violation of the Fourth Amendment. In *Stone* v. *Powell*, 428 U.S. 465, 494 (1976), the Supreme Court foreclosed habeas review of Fourth Amendment claims where the state court provides a full and fair

opportunity to litigate such claims. Here, Ruvalcaba had a full and fair opportunity to litigate his Fourth Amendment claim before the state courts. Thus, he is not entitled to habeas relief. As such, claim (2) is denied.

## C.    Claim (3): prosecutorial misconduct

Ruvalcaba claims that the prosecutor engaged in misconduct because he misstated the law during his closing argument. Specifically, Ruvalcaba asserts that during closing arguments the prosecutor incorrectly informed the jury that the prosecution did not have the burden of proving that Ruvalcaba's conduct was not justified. (Pet. Appendix at 56.) Ruvalcaba argues that the effect of these comments was to shift the burden to prove justification to him, thereby preventing a fair trial. Further, Ruvalcaba claims that the State compounded this error when the prosecution told the jury that it had to prove only two elements for a guilty verdict of first degree murder when, in fact, the judge included as a third element the requirement that the State prove beyond a reasonable doubt that Ruvalcaba "was not justified in using the force which he used." (*Id.*) Finally, Ruvalcaba asserts that in rebuttal the prosecutor improperly told the jury that Ruvalcaba was attempting to put the State's witnesses on trial and inappropriately argued that his defense counsel placed witnesses on the stand to elicit sympathy in contradiction to the instructions from the court. (*Id.*) In sum, Ruvalcaba claims that the prosecutor's statements had the effect of denying him a fair trial. (*Id.*) Because Ruvalcaba fairly presented this claim on direct review, the court considers this claim on the merits.

To show prosecutorial misconduct, Ruvalcaba must first demonstrate that the prosecutor's remarks were improper. *Darden* v. *Wainwright*, 477 U.S. 168, 181 (1986); *United States* v. *Badger*, 983 F.2d 1443, 1450 (7th Cir. 1993.) Further, Ruvalcaba must show that the

improper remarks "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden*, 477 U.S. at 181. In evaluating the claim for prosecutorial misconduct, the court considers several factors, namely, "(1) whether the prosecutor misstated the evidence, (2) whether the remarks implicate specific rights of the accused, (3) whether the defense invited the response, (4) the trial court's instructions, (5) the weight of the evidence against the defendant, and (6) the defendant's opportunity to rebut." *Hough* v. *Anderson*, 272 F.3d 878, 903 (7th Cir. 2001). "These factors, however, are not to be applied in a rigid manner, but should be used as a guide to determine whether there was fundamental unfairness that infected the bottom line. For that reason, [courts] often have characterized the weight of the evidence as the most important consideration." *Id.* (internal citations and quotations omitted).

On review of the prosecutor's remarks, the Illinois Appellate Court concluded that the statements were not improper. (Resp't Ex. B at 33-38.) Specifically, the Illinois Appellate Court determined that the prosecutor's statements described the process involved in determining whether Ruvalcaba was guilty of either first degree murder or second degree murder. (*Id.* at 33.) Further, the Illinois Appellate Court determined that the prosecutor did not imply that there were only two elements for first degree murder. Instead, the court found that the prosecutor stated the third element, *i.e.*, that Ruvalcaba was not justified in committing first degree murder and concluded by stating that there were no mitigating factors showing that the murder was lawfully justified. (*Id.* at 34.) Moreover, the court determined that the prosecutor never stated that Ruvalcaba failed to prove that he had not been justified in his use of force. (*Id.* at 35.) Rather, the Illinois Appellate Court found that the prosecutor implicitly argued that the State had met its burden of showing that Ruvalcaba was not justified in using the force. (*Id.*) Thus, the Illinois

Appellate Court determined that, read in context, the challenged statements occurred during the prosecutor's comments regarding lawful justification, which was a specific aspect of the State's case. (*Id.*) In addition, the Illinois Appellate Court concluded that the jury instructions cured any possible prejudice because the instructions included the State's burden of proof, the elements of murder, and the directive to disregard statements made during arguments that were not based on the evidence. (*Id.*)

With respect to the comments made during the prosecutor's rebuttal, the Illinois Appellate Court determined that the comments did not shift the burden of proof to Ruvalcaba by improperly telling the jury that Ruvalcaba was attempting to put the State's witnesses on trial. (*Id.* at 36.) Rather, the court found, upon review of the record, that the prosecutor was merely responding to defense counsel's argument and that defense counsel prompted the complained of statements during his closing argument when he attacked the State's case and credibility of the State's witnesses. (*Id.* at 37.) With respects to Ruvalcaba's claim that the prosecutor's closing argument implied that defense counsel was attempting to trick the jurors by appealing to their sympathies, the Illinois Appellate Court determined that the comments constituted a *de minimis* portion of the State's closing argument and were not improperly suggesting that Ruvalcaba was attempting to trick the jury into acquitting him by appealing to their sympathies. Rather, the court found that the prosecutor made fair comments based on defense counsel's closing remarks, which were an attack on the credibility of State's witnesses, an attempt to convince the jury to ignore the evidence and to show that Ruvalcaba acted in justifiable self-defense. (*Id.*)

The court agrees with the Illinois Appellate Court's reasoning that the prosecutor's statements were not improper when placed in context. Primarily, Ruvalcaba does not show that

the prosecutor misstated the evidence that weighed against him for the first degree murder offense. With respect to the prosecutor's statement that the defense counsel was attempting to put the State's witnesses on trial, the Illinois Appellate Court reasonably determined that the defense counsel invited the comment when counsel attacked the credibility of the State's witnesses. Similarly, the prosecutor's comment concerning defense counsel's attempt to appeal to the jury's sympathies was not improper because the complained of comment was prompted by the defense counsel's attack on the State's case and witnesses. *See Badger*, 983 F.2d at 1452 ("If the defense strikes the first blow, then the prosecutor's response is within the bounds of proper argument."). Moreover, the Illinois Appellate Court reasonably determined that any prejudice that resulted from the prosecutor's comments was cured by the tendered instructions, which included the State's burden of proof, the elements of murder, and the directive to disregard statements made during arguments that were not based on the evidence. *See United States* v. *Bell*, 980 F.2d 1095, 1098 (7th Cir. 1992) (it is presumed that juries follow court directed instructions); *see Hough,* 272 F.3d at 904 (finding that trial court's instructions put jury on notice that the arguments were nothing more than counsel's interpretation of the evidence). In addition, Ruvalcaba cannot show that any improper statements made in closing argument and rebuttal affected the jury verdict based on the weight of the evidence proffered against him at trial. *See Darden*, 477 U.S. at 182 (concluding that overwhelming evidence reduced the likelihood that the jury's decision was influenced by argument despite serious prosecutorial misconduct). For these reasons, Ruvalcaba cannot show that the Illinois Appellate Court's reasoning was contrary to, or involved an unreasonable applicable of, *Darden. See* § 2254(d)(1); *Williams,* 529 U.S. at 407. Thus, the court denies claim (3).

**D.      Claim (4): the State failed to prove Ruvalcaba's guilt beyond a reasonable doubt**

Ruvalcaba claims that the State failed to prove his guilt beyond a reasonable doubt

because the State did not prove that his use of force was not justified. (Pet. Appendix at 65.)

Because Ruvalcaba fairly presented this claim on direct review, the court considers this claim on

the merits.

For a sufficiency of the evidence claim, the court must ask: "whether after viewing the

evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found

the essential elements of the crime beyond a reasonable doubt." *Jackson* v. *Virginia*, 443 U.S.

307, 319 (1979) (emphasis in original). In applying this standard, the habeas court gives

deference to the trier of fact and does not make credibility determinations, substitute judgments

or re-weigh the evidence. *See Ford* v. *Ahitow*, 104 F.3d 926, 938 (7th Cir. 1997) (stating, "in

*Jackson*, [443 U.S. at 319,] the Court made clear that the responsibility for resolving conflicts in

the testimony, for weighing the evidence and for drawing reasonable inferences from the basic

facts to ultimate facts, is indeed the domain of that trier of fact"); *United States* v. *Mejia*,

909 F.2d 242, 245 (7th Cir. 1990) ("Credibility is for the jury, not this court, to determine [the

witness's] testimony was not inherently unbelievable; it did not contradict the laws of nature or

other indisputably true evidence.").

The Illinois Appellate Court concluded that the State produced sufficient evidence at trial

to support the jury's verdict that Ruvalcaba unjustifiably fired at the unarmed victims. (Resp.

Ex. B at 39.) The Illinois Appellate Court reasoned:

> A review of the record firmly demonstrates that none of the victims had a
> gun in their possession in the alley at the time of the shooting and they had been
> retreating from the alley when defendant pulled his gun from his waistband and

fired it into the alley. Defendant's court-reported statement, discussed above and
shown to have been properly admitted into evidence, refutes defendant's self-
defense argument because in it defendant states that the victims were unarmed and
were fleeing as he pointed his loaded gun towards a fence in the general direction
of two of the victims and continuously pulled the trigger until the round went off.
Any doubt that defendant acted justifiably is defeated by his own confession. *See
People v. Smith*, 27 Ill. 2d 344, 349 (1963) (a confession "is the highest type of
evidence known to the law"). Given the evidence adduced at trial, and reviewing
it in the light most favorable to the prosecution, any rational trier of fact could
have found defendant guilty beyond a reasonable doubt of the crimes charged.

(*Id.* at 39-40.)

Ruvalcaba claims that the Illinois Appellate Court made an unreasonable determination
based on the facts. Specifically, Ruvalcaba asserts that the facts show he acted justifiably
because the evidence establishes that Flores had gunshot residue on his right palm and thus
Flores had a gun. (Pet. Appendix. at 65.) At trial, however, the State maintained that Flores
secured the gun after Ruvalcaba and Meneses shot at them. (*Id.*)

"[A] federal habeas corpus court faced with a record of historical facts that supports
conflicting inferences must presume - even if it does not affirmatively appear in the record - that
the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that
resolution." *Jackson*, 443 U.S. at 326. Here, Ruvalcaba requests the court to make credibility
determinations in his favor, which this court cannot do on habeas review. The jury credited the
State's theory as to why Flores had the gunshot residue on his hand. Moreover, the Illinois
Appellate Court recognized the inconsistent statement that Ruvalcaba gave during his confession
and at trial. For these reasons, the Illinois Appellate Court concluded that Ruvalcaba's
allegations of justifiable force were not supported by the record. As such, the Illinois Appellate
Court "provided fair process and engaged in reasoned, good-faith decision making while

25

applying *Jackson*'s 'no rational trier of fact' test[.]" *See Gomez* v. *Acevedo*, 106 F.3d 192, 199 (7th Cir. 1996); *Herrera* v. *Collins*, 506 U.S. 390, 402 (1993) (finding that "the *Jackson* inquiry does not focus on whether the trier of fact made the correct guilt or innocence determination, but rather whether it made a rational decision to convict or acquit.") Thus, Ruvalcaba does not show that the Illinois Appellate Court's reasoning was contrary to, or involved an unreasonable application of, *Jackson*. *See* § 2254(d)(1); *Williams*, 529 U.S. at 407. As such, the court denies claim (4).

**E.     Claim (5): excessive sentence**

Ruvalcaba claims that the trial court abused its discretion when it sentenced him to 50 years in prison because it failed to consider his rehabilitative potential. (Pet. Appendix. at 65.) "In considering a petition for habeas relief, a federal court must defer to the prerogative of the state legislature to determine the sentences imposed for state crimes." *United States* v. *Pierce*, No. 01 C 7657, 2003 WL 76869, at *2 (N.D. Ill. Jan. 8, 2003), citing *Rummel* v. *Estelle*, 445 U.S. 263, 275 (1980). Generally, if the sentence imposed by the trial court falls within Illinois's established range, its severity is not sufficient grounds for relief on federal habeas review. *Henry* v. *Page*, 223 F.3d 477, 482 (7th Cir. 2000). "[C]hallenges to sentences within statutory limits, in the absence of evidence that the trial court lacked jurisdiction to impose it or that the conviction itself was unconstitutional, are simply not cognizable on habeas review." *United States ex. rel. King* v. *Chahill-Maching*, 169 F. Supp. 2d 849, 855 (N.D. Ill. 2001), citing *United States* v. *Addonizio*, 442 U.S. 178, 186 (1979)).

A person convicted of felony first degree murder in Illinois may be sentenced to serve twenty to sixty years in prison. 730 ILCS 5/5-8-1(a)(1)(a). The record shows that the trial court

considered Ruvalcaba's rehabilitative potential, Ruvalcaba's age, the fact there were no other prior convictions on his record, and other mitigating factors. Nonetheless, the trial court explained that it imposed a 50 year sentence based on the seriousness of the offense. (Resp. Ex. B at 41-42.)

Because Ruvalcaba's sentence was in the proscribed range, he cannot prevail on his excessive sentence claim. Ruvalcaba fails to proffer, nor does this court find, proof showing that the trial court lacked jurisdiction to impose the sentence or that his conviction was the result of constitutional error. For these reasons, Ruvalcaba's claim of an excessive sentence is non-cognizable on habeas review. Thus, the court denies claim (5).

## ORDER

For the reasons stated above, the court concludes that Ruvalcaba is not entitled to relief. This case is terminated.

Enter:

JOAN HUMPHREY LEFKOW
United States District Judge

Date: January 5, 2004